863 A.2d 478

**Barbara BERNOTAS and Joseph Bernotas, h/w,**

**v.**

**SUPER FRESH FOOD MARKETS, INC.**

**v.**

**Goldsmith Associates and Acciavatti Associates.**

**Appeal of Goldsmith Associates.**

Supreme Court of Pennsylvania.

Submitted Nov. 6, 2003.

Decided Dec. 22, 2004.

Joshua Derl Harvey, Phillip B. Silverman, Philadelphia, for Goldsmith Associates.

Catherine M. Lecky, Burke, Joseph F. Van Horn, Jr., Philadelphia, for Acciavatti Associates.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice EAKIN.

In 1992, Barbara Bernotas, a patron of the Super Fresh Food Market, sustained serious injuries when she fell into a hole in the floor at a construction area inside the store. The general contractor, Acciavatti Associates, hired subcontractor Goldsmith Associates to perform electrical work in accordance with the plans and specifications of the general contract, Contract MV–1219, between Acciavatti and Super Fresh's

parent company, A & P. Dated May 5, 1983, Contract MV–1219 covered all work commencing on that date until further notice at all A & P locations, whether owned or leased.

Bernotas sued Super Fresh for her injuries. The store filed a cross-claim joining Acciavatti and Goldsmith, claiming contractual entitlement to complete indemnification. In 1998, Bernotas settled for $200,000, with each defendant contributing one-third of the amount. Super Fresh then sought indemnification under the terms of Contract MV–1219, Article XII, which required "[t]he Contractor . . . [to] assume entire responsibility and liability for any and all damage or injury of any kind . . . caused by . . . the execution of the work provided for in this Contract . . . ," provided Super Fresh was not solely negligent. A bench trial was held in 2001, to determine whether Acciavatti was required to indemnify Super Fresh under Contract MV–1219, and whether Goldsmith was required to indemnify Acciavatti under the subcontract.

The trial court did not make a factual finding of the exact cause of the injury. Instead, it found Super Fresh was not solely negligent, as both Acciavatti and Goldsmith failed to provide a safe work area. Thus, Acciavatti's obligation to indemnify Super Fresh under the general contract was triggered. Acciavatti was required to pay two-thirds of the damages (its own one-third as well as the one-third attributed to Super Fresh because of its contractual obligation to indemnify Super Fresh), while Goldsmith was required to pay the remaining one-third. Acciavatti appealed, claiming Goldsmith had agreed to indemnify Acciavatti pursuant to an incorporation clause in the subcontract, and was therefore responsible for the entire settlement.

The Superior Court reversed the trial court's decision requiring Goldsmith to pay only one-third of the award, concluding Goldsmith was obligated to indemnify Acciavatti. *Bernotas v. Super Fresh Food Markets, Inc. v. Goldsmith Assoc. and Acciavatti Assoc.*, 816 A.2d 225, 234 (Pa.Super.2002). The parties had agreed the indemnification provision in Article XII was sufficiently specific to require Super Fresh to be indemnified unless it was solely negligent. Accordingly, the

only remaining dispute was whether the subcontract clause incorporating the terms of Contract MV–1219 required Goldsmith to indemnify Acciavatti for acts which were not solely the result of either Acciavatti's or Super Fresh's negligence.

The Superior Court decided this question affirmatively. It determined the subcontract, by incorporating the terms of Contract MV–1219, created a pass-through indemnification provision which transferred to Goldsmith the contractual obligations Acciavatti owed to Super Fresh. The subcontract included an incorporation clause noting the "[prime] Contract Documents form a part of this Subcontract, and are as fully a part of this Subcontract as if attached to this agreement and as if herein set forth at length." Acciavatti's Answer, Exhibit A. The Superior Court ruled this clause "created a conduit through which the obligations embodied in the prime contract flowed from that contract to the one between [Acciavatti] and Goldsmith to the extent that the obligations were within the ambit of the subcontract." *Bernotas*, at 231. Acknowledging the absence of express "agree to be bound" language that usually signals an intent to bind subcontractors to the terms of the prime contract, the Superior Court also discussed additional paragraphs (Paragraphs 11 and 13) of the subcontract agreement which, it concluded, showed Goldsmith agreed to perform in accordance with the terms of the prime contract. *Id.,* at 229–230. Paragraph 11 states "[Goldsmith] agrees to fully perform and to assume all obligations and liabilities of [Acciavatti] under the General Contract for the work, or as may be imposed [thereafter] by law, including but not limited to all warranties and guarantees." Paragraph 13 contains the following provision:

> [Goldsmith] hereby releases [Acciavatti] and [Super Fresh] from any and all claims ... for personal injury ... arising out of any matter occurring at location of the Work ... and further, [Goldsmith] agrees to indemnify and to hold harmless [Acciavatti] and [Super Fresh] ... from and against any claim, loss, damage, liability or expense ... occurring to any property or for personal injury ... as ... may result from or arise from the performance, lack of performance or

improper performance of the Work whether such matter may arise or occur on the location of the Work....

*Id.* at 233 (citing Subcontract Agreement ¶ 13); Acciavatti's Answer, Exhibit A.

The Superior Court also held Paragraph 11 of the subcontract incorporated all provisions of the prime contract, including assumption of liabilities for the work, and that Goldsmith therefore stepped into the shoes of Acciavatti and assumed the risk of all liability except when caused solely by Super Fresh. *Id.,* at 231. The Superior Court interpreted Paragraph 13 of the subcontract, which "releases" both Acciavatti and Super Fresh from liability "arising out of any matter occurring at [the] location of the Work" and "indemnif[ies] and to hold[s] harmless [the Acciavatti contractor] and owner ... from and against any ... liability ... for personal injury ... from the performance, lack of performance, or improper performance of the Work ...," to mean any incident occurring at the location of the work site would fall under the purview of this clause and trigger indemnification by Goldsmith. *Id.,* at 233.

Accordingly, the court remanded the case to the trial court for entry of an order directing Goldsmith to pay the entire $200,000 judgment.

We granted review to decide whether the conduit or pass-through indemnification theory employed by the Superior Court is consistent with this Court's holdings requiring negligence indemnification provisions to be expressly and unequivocally stated in a contract between two parties.

The pass-through theory is novel in Pennsylvania but has been examined in other jurisdictions. The Alaska Supreme Court has recognized the operation of a conduit clause in a subcontract agreement, holding that a delay damages provision passes through a prime contract to the subcontract. *Indus. Indem. Co. v. Wick Constr. Co.,* 680 P.2d 1100, 1106 (Alaska 1984). The Alaska Court rejected the contractor's argument that the conduit clause incorporated only the substantive aspects relating to work specifications and not the remedial provisions, because no support existed for the con-

tention that obligations but not the rights and remedies passed through the conduit clause. *Id.* Similarly, in *Sime Constr. Co. v. Washington Pub. Power Supply Sys.*, 28 Wash. App. 10, 621 P.2d 1299, 1302 (1980), the Washington Courts of Appeals rejected plaintiffs' claim that the notice procedures of a delay damages provision were not incorporated by reference in the subcontract because the incorporation was intended only to define the scope and specifications of the work. Rather, the Court held the incorporation clause, which was general and unlimited, incorporated both the contract specifications and procedural provisions of the prime contract. *Id.*, at 1303.

A clause requiring arbitration to settle disputes in a prime contract was also held to be incorporated by reference into a subcontract through a "flow down" clause, particularly because the disputes would always arise from "the work to be performed," according to the language of the flow down clause. *Turner Constr. Co. v. Midwest Curtainwalls, Inc.*, 187 Ill.App.3d 417, 135 Ill.Dec. 14, 543 N.E.2d 249, 250–52 (1989). Without referring to any conduit language, a New York court held a subcontractor was required to fulfill a work performance provision contained in the prime contract when the subcontract required the subcontractor to perform the work in accordance with the prime contract. *J & J Structures, Inc. v. Callanan Indus., Inc.*, 215 A.D.2d 890, 626 N.Y.S.2d 891 (1995).

None of these cases, however, applied the pass-through theory to a clause indemnifying one party for acts of another party's negligence and, as such, are distinguishable from the present case. Several courts have directly rejected the pass-through or implied indemnity theory in the context of indemnification for negligence clauses. The Supreme Court of California held that without specific and unambiguous language in the subcontract, a subcontractor was not obligated to indemnify the contractor against its own negligence, even when the subcontract provided the subcontractor was bound "in the same manner and to the same extent as [contractor] is bound to Owner under the General Contract" and the prime contract contained an indemnification from negligence provision re-

gardless of who was responsible. *Goldman v. Ecco–Phoenix Electric Corp.,* 62 Cal.2d 40, 41 Cal.Rptr. 73, 396 P.2d 377 (1964). The court required an express undertaking in the document to protect the indemnitee from its own negligence. *Id.,* at 379. Applying *Goldman,* the Court of Appeals of Arizona rejected the argument that an indemnification clause in the prime contract required the subcontractor to indemnify the contractor for acts of the contractor's negligence even when the prime contract was incorporated by reference in the subcontract. *Allison Steel Manufacturing Co. v. Superior Court of Arizona,* 22 Ariz.App. 76, 523 P.2d 803 (1974). The court expressed support for the rule that a contract for indemnity will not be construed to cover the contractor's liability for its own negligence unless this intention is expressed in clear and unequivocal terms. *Id.,* at 806. The court noted the general contractor drafted the agreement and the terms of the agreement were not arrived at by negotiations between the parties, and nothing prevented the contractor from including a specific provision in the subcontract. *Id.,* at 807. Similarly, the prime contract in *General Electric v. Hatzel & Buehler, Inc.,* 19 A.D.2d 40, 240 N.Y.S.2d 636 (1963), included an indemnification provision for losses for personal injuries resulting from performance of the work. *Id.,* at 638. Despite finding the subcontract plainly indicated the subcontractor would comply with "all provisions, terms, specifications, and requirements" of the general contract, the court held the subcontractor did not undertake to assume the absolute liability imposed in the general contract because the indemnity clause in the subcontract was not broad enough to cover such liability. *Id.* The separate indemnification provision contained in the subcontract governed because it simply carved out a smaller portion of the large area of liability imposed by the prime contract. *Id.,* at 638–39.

Various jurisdictions consider clauses providing indemnification from a subcontractor for negligence not caused by the subcontractor a violation of public policy. *See Vey v. Port Authority of New York,* 79 A.D.2d 920, 434 N.Y.S.2d 412, 414 (1981) (subcontract evidenced no intent by parties to be bound

by indemnification arising out of separate contract between different parties, but only against claims arising out of work covered by subcontract); *Ghilardi v. Natl. Riverside Co.*, 1995 WL 808924, 1995 Mass.Super. LEXIS 729 (1995) (indemnity provisions contained in construction contracts void when subcontractor is obligated to indemnify any party for injury not caused by the subcontractor); *IU North Am. v. The Gage Co.*, 2002 WL 1277327 at *5, 2002 U.S. Dist. LEXIS 10275 at *14 (E.D.Pa.2002) (applying Pennsylvania law narrowly construing indemnity provisions to negligence and strict liability, no presumption indemnitor intended to assume contractual liability of indemnitee unless subcontract expressly stipulates).

 It is well-settled in Pennsylvania that provisions to indemnify for another party's negligence are to be narrowly construed, requiring a clear and unequivocal agreement before a party may transfer its liability to another party. *Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 588 A.2d 1, 7 (1991); *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907). Accordingly, indemnification provisions are given effect only when clearly and explicitly stated in the contract between two parties. *Greer v. City of Phila., et al.*, 568 Pa. 244, 795 A.2d 376, 380 (2002) ("[u]nless the language is clear and unambiguous ... we must opt for the interpretation that does not shoulder [subcontractor] with the fiscal responsibility for [contractor's] and [owner's] negligence."). The Superior Court acknowledged the dearth of case law pertaining to its pass-through theory as applied to indemnification for negligent acts, but concluded pass-through provisions are an accepted means of transferring risk. However, the court did not cite cases recognizing pass-through indemnity for negligence via a general incorporation clause in a subcontract.

 As the Third Circuit recently acknowledged, this Court has not addressed whether an indemnity provision in a subcontract extends to a contractor's liability to indemnify a third party, where the obligation is not expressed in clear and unequivocal terms. *Jacobs Constructors, Inc. v. NPS Energy Srvcs., Inc.*, 264 F.3d 365, 371 (3d Cir.2001). Applying sub-

stantive Pennsylvania law, the court reviewed the underlying policies of the *Perry–Ruzzi* rule and ultimately determined this Court would hold the *Perry–Ruzzi* doctrine applies to indemnity claims for losses contractually assumed by the indemnitee. *Id.*, at 371–72. Citing *Perry*,[1] the court noted, "[S]uch indemnification imposes an 'unusual' and 'extraordinary' obligation in the same manner as indemnification for one's own negligence." *Id.*, at 372. Although the aforementioned authorities confirm pass-through clauses may be generally enforceable, as noted by the Third Circuit, upholding these provisions strictly in the case of indemnification clashes with our rule of law requiring indemnification language to be unequivocally stated in the contract.

■ The subcontract agreement between Acciavatti and Goldsmith does not clearly express the parties' intentions regarding the issue of indemnification. The language in the subcontract (Paragraph 13) could be interpreted to mean Goldsmith would indemnify Acciavatti *only* in the event of negligence resulting from the *performance* of Goldsmith's work. Goldsmith argues this provision specifically states it is not required to indemnify Acciavatti and/or Super Fresh for *either's* negligent acts not arising from the performance of Goldsmith's work. This interpretation is plausible when read in concert with the preceding language referring to a release of claims from any incidents occurring at the work site, which Goldsmith argues is distinct from its indemnification provision. Because the incident merely occurred at the work site, and was never found to have resulted solely from the performance of Goldsmith's work, the indemnification provision is not triggered.

■ The subcontract also includes a clause incorporating the provisions of the general contract between Acciavatti and

1. "[A] contract of indemnity … should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms. The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation." *Perry*, at 557.

Super Fresh by reference. The general contract clearly states contractors will indemnify Super Fresh for any liability which is not solely the result of Super Fresh's negligence. While the language of this contract is clear and unequivocal, allowing such indemnification to automatically pass through to the subcontract agreement through a standard incorporation clause, assigns more liability to the subcontractor than the subcontractor accepts via the subcontract alone. Furthermore, both the terms introduced by the incorporation clause and the terms of Paragraph 11 of the subcontract conflict with a plausible interpretation of Paragraph 13. The resultant ambiguity in the subcontract fails the rigidly respected specificity requirement for indemnification for negligence clauses.

■ We therefore hold, unless expressly stated, pass through indemnification clauses violate the long standing policy underlying the rule narrowly construing indemnification provisions. When the provision sought to be "passed through" involves indemnification for acts of another party's negligence, the theory will not be applied, unless the contract language is clear and specific. Sound public policy requires an unequivocally stated intention to be included in the subcontract for this particular type of provision to pass through from the general contract. The general language of a standard incorporation clause cannot trump the specific language of the subcontract, when the former supports indemnification for negligent acts but the latter is ambiguous regarding the circumstances under which indemnification will occur.

The order of the Superior Court is reversed. Jurisdiction relinquished.

Justice SAYLOR files a dissenting opinion.

## DISSENTING OPINION

Justice SAYLOR.

The majority addresses in tandem what I regard as two distinct issues which, although subject to a number of overlapping considerations, I believe are best treated separately.

The first and broader question is whether and to what extent this Court will recognize contractual, flow-through indemnity as a general proposition in the construction law setting. The second is whether the Court will apply the *Perry/Ruzzi* rule in relation to such claims, thus effectively obviating flow-through indemnification pertaining to circumstances involving negligent acts or omissions on the part of the party claiming a right to contractual indemnification.

Concerning the first of these issues, the competing points of view can be examined by way of reference to decisional law of other jurisdictions.[1] On this question, although I tend toward the view that, at least in certain circumstances flow-through indemnification should be recognized in the construction law setting to give appropriate effect to the parties' intentions and common practices,[2] I do not believe that such issue needs be

**1.** *Compare Whittle v. Pagani Bros Constr. Co.*, 383 Mass. 796, 422 N.E.2d 779, 781 (1981) (holding, under a fair-import construction, that a subcontract flow-through clause was sufficient to impose on the subcontractor an obligation to indemnify the contractor to the same extent that the prime contract required the contractor to indemnify the owner); *Binswanger Glass Co. v. Beers Constr. Co.*, 141 Ga.App. 715, 234 S.E.2d 363, 365 (1977) (same, from a strict construction perspective), *with Howe v. Lever Bros. Co.*, 851 S.W.2d 769, 774 (Mo.Ct.App. 1993) (rejecting flow-through indemnity in the setting of a subcontract, on the ground that the contractual flow-through provision applied only to the scope of the work). *See generally* DWIGHT G. CONGER, MICHAEL T. LYNCH AND MARY CATHERINE RENTZ, CONSTRUCTION ACCIDENT LITIGATION § 6:32 (2004) (synopsizing the decisional law of various jurisdictions as follows: "[T]the courts are willing to recognize the efficacy of step-over clauses and grant indemnification based upon indemnity provisions in the incorporated documents so long as the step-over clause clearly and unambiguously incorporates the extraneous document without limiting its application to some aspect of the contractual relationship which would normally exclude considerations of indemnity, *i.e.,* 'material to be supplied and work to be performed,' and the like."); 3 BRUNER & O-CONNOR CONSTR. LAW § 10:20 (2004) ("Because it is common for construction contracts to contain incorporation-by-reference or flow-down clauses, a party to an agreement containing such a clause may find itself obligated to provide indemnity to the other contracting party to the same extent that that party must indemnify another under the terms of the prime contract.").

**2.** One set of commentators framed such considerations along the following lines:

It is in the nature of the principal construction contract that the entire body of work to be performed on the premises is described

decided in this case, since, in addition to the flow-through obligations clause, the Acciavatti/Goldsmith subcontract contained an express indemnification provision. *See* RR at 175a (reflecting the subcontract provision to the effect that "SUB-CONTRACTOR agrees to indemnify and hold harmless the CONTRACTOR and owner ... from and against all claims, loss, damage, liability or expense ... as may arise from the performance, lack of performance or improper performance of the Work"). In this situation, the presence of both an express indemnification obligation and one flowing from the prime contract creates an ambiguity concerning the scope of Goldsmith's attendant responsibility, implicating the well-established principle that the ambiguity should be resolved against the drafter (here, Acciavatti).[3] *See Central Transp., Inc. v. Board of Assessment Appeals of Cambria County,* 490 Pa. 486, 496, 417 A.2d 144, 149 (1980); *accord Reed v. Long,* 327 F.2d 611, 615 (6th Cir.1964) ("Why would this provision for indemnification be placed in the subcontract if it were intended that the broad reference to the General Conditions would include Section 30 (a very broad and inclusive provision for indemnification)[?]"). Thus, it is my position that the subcontractor generally should be held only to the more restricted indemnity obligation, here, that which is contained in the subcontract. *Accord Reed,* 327 F.2d at 615; *cf. Valerio v. R & R Constr. Co.,* 20 Ill.App.3d 48, 312 N.E.2d 713, 716 (1974). *See generally* 3 BRUNER & O–CONNOR CONSTR. LAW § 10:20. As noted, application of such analysis would obviate any need to address the general availability of flow-through indemnity in the context of this case.

> therein. By entering into the general contract, the owner has communicated to the general contractor not only what he wants done on his property, but how and in what manner his ownership interests are to be protected by the general contractor. When the general contractor in turn hires his subcontractors, there is really no necessity to 'reinvent the wheel.' Many general contractors utilize form contracts with space for incorporating the general contract by reference. In this way, the general contractor intends that the general contract actually be an integral part of the subcontract.
>
> CONGER, *et al.,* CONSTRUCTION ACCIDENT LITIGATION § 6:32.

3. The Acciavatti/Goldsmith subcontract appears on Acciavatti letterhead. *See* RR at 173a.

As to the actual terms of the Acciavatti/Goldsmith subcontract's express indemnification provision, I disagree with the majority that there is an ambiguity that requires a reading affording indemnification only in the event that damage results *solely* from the performance of the subcontractor's work. *See* Majority Opinion, *op.* at 483. To the contrary, the clause contains no such exclusivity language. Indeed, it seems to me that such an interpretation renders the provision largely self-defeating, as accidents can frequently be viewed as resulting from a confluence of concurrent causes (to include, for example, inattention on the part of the injured plaintiff in the underlying action). While I acknowledge the correctness of the majority's observation that the release language preceding the relevant indemnification proviso is considerably broader in scope, *see* Majority Opinion, *op.* at 483, I do not agree that this justifies a restriction on indemnity that is inconsistent with the plain language of the agreement.

The Acciavatti/Goldsmith subcontract does, however, lack a provision which would allow for indemnification relative to acts of negligence on the part of the indemnitee (Acciavatti), and therefore, the *Perry/Ruzzi* principle applies to foreclose indemnification in such instance. *See Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 7, 588 A.2d 1, 4 (1991). The trial court's finding of concurrent negligence on Acciavatti's part by virtue of its failure to maintain a safe work site would therefore seem to insulate Goldsmith from indemnification liability.

My only reservation about reversing the Superior Court's decision on this ground stems from the vagueness of the evidentiary presentation that was made before the trial court (perhaps by no fault of the parties, but rather, by virtue of uncertainties surrounding the facts), as well as the highly generalized nature of the court's resultant findings. In this regard, I would note that application of the *Perry/Ruzzi* principle is justified only in instances involving negligent acts or omissions on the part of the indemnitee that would give rise to primary liability on its part. *See Urban Redev. Auth. v. Noralco Corp.*, 281 Pa.Super. 466, 477–78, 422 A.2d 563, 569 (1980) (holding that contractual indemnity was available rela-

tive to an indemnitee's secondary liability, despite there being no express indemnification provision addressing indemnitee negligence).[4] This Court's recent decision absolving contractors of workplace safety obligations delegated to subcontractors, *see Leonard v. PennDOT*, 565 Pa. 101, 108–09, 771 A.2d 1238, 1242 (2001), which was issued in the same time frame as the trial court's decision but was not acknowledged by it, also seems to me to be potentially implicated by the facts.

In these regards, Goldsmith's brief contains a concession that its subcontract with Acciavatti delegated to it the responsibility to maintain a safe work place relative to the electrical work. *See* Brief of Appellant at 11. Facially, it appears that the plaintiff's accident in this case may have resulted from her contact with an electrical conduit pipe that was left protruding from the floor after demolition and removal work had been completed in the construction project entailing relocation of supermarket offices.[5] *Leonard* would seem to foreclose a

4. Notably, the circumstances underlying both the *Perry* and *Ruzzi* decisions involved primary liability on the part of the indemnitee as a sole or joint tortfeasor. *See Ruzzi*, 527 Pa. at 6, 588 A.2d at 3 (involving an effort to obtain indemnification by a party that was found to have been 84 percent negligent in a jury trial); *Perry v. Payne*, 217 Pa. 252, 255, 66 A. 553, 554 (1907) (involving negligence on the part of the indemnitee's employee in lowering an elevator on a painter, causing his death). Indeed, as secondary liability is the basis for common law indemnification theory, *see Builders Supply Co. v. McCabe*, 366 Pa. 322, 328, 77 A.2d 368, 371 (1951), it seems to me that the policy considerations at work in *Perry/Ruzzi* simply are not relevant in relation to contractual indemnification claims asserted by persons subject only to secondary liability on the underlying claim. *See generally* 42 C.J.S. INDEMNITY § 15 (2004) ("Where an indemnity provision does not specifically address what effect the indemnitee's negligence will have on the indemnitor's obligation, it is a general indemnity agreement, and the indemnitee is not entitled to indemnification for loss resulting from its own active negligence, but only for its own passive negligence."). While use of the terms "active" versus "passive" negligence has been criticized in this setting based on their vagueness, *see, e.g. Urban Redev.*, 281 Pa.Super. at 479–83, 422 A.2d at 570–72 (Spaeth, J., concurring); *see also City of Pittsburgh v. American Asbestos Control Co.*, 157 Pa. Cmwlth. 235, 240, 629 A.2d 265, 268 (1993), the primary versus secondary liability distinction remains a meaningful one.

5. The majority is correct in noting that the trial court did not specify the cause of the accident. It is noteworthy, however, that the record contains no evidence of any specific potential cause related to workplace safety other than the conduit pipe, and the common pleas court's

finding of concurrent liability within the scope of such delegation, *see Leonard,* 565 Pa. at 108–09, 771 A.2d at 1242, thus rendering questionable the trial court's determination that both Acciavatti and Goldsmith were at fault,[6] at least in the absence of more detailed factual findings.[7]

I would therefore vacate the Superior Court's order and remand to the common pleas court for specific findings concerning the cause of the accident and responsibility for workplace safety and/or debris removal relative to such cause. If the court were to determine that the evidence is insufficient to support concrete findings in these regards, I would direct that it enter judgment in favor of Goldsmith, as the burden of proof was at all times upon Acciavatti, the party seeking indemnification. *See McClure,* 401 Pa.Super. at 231, 585 A.2d at 22.

---

liability finding must necessarily subsume some assessment of causation. *See generally McClure v. Deerland Corp.,* 401 Pa.Super. 226, 231, 585 A.2d 19, 22 (1991) (observing that a party seeking contractual indemnification must establish, *inter alia,* the validity of the underlying cause and the reasonableness of the settlement). Thus, it appears to me that the court may have attributed the injury to the conduit pipe (it is interesting to note that the only specific evidence to the effect that the plaintiff tripped on the pipe was admitted over an at least facially legitimate hearsay objection lodged by Goldsmith, *see* N.T., Mar. 26, 2001, at 129–34; the issue of the validity of such objection, however, has not been presented to this Court at this time), and the uncertainty in this regard could be clarified via a remand.

6. Were the matter to be remanded, it is possible that Acciavatti's participation in the settlement of the underlying cause could be deemed reasonable on a secondary liability theory in spite of *Leonard,* since, although *Leonard* predated the common pleas court's decision on indemnification, the law in this regard remained uncertain at the time of the settlement.

7. There is also some suggestion in the record that the conduit pipe may have been a remnant from prior construction that was not within the scope of Goldsmith's work, *see* N.T., March 26, 2001, at 118–20 (testimony from a Goldsmith supervisor suggesting that Goldsmith's work was directed to overhead wiring, and not wiring from the floor area), which, if found as a fact, would render it outside the scope of the acknowledged delegation here.